UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW JERSEY

| | |
|---|---|
| RAYMOND FAWOLE,<br><br>    Plaintiff,<br><br>v.<br><br>NEWARK BETH ISRAEL HOSPITAL,<br><br>    Defendant. | Civ. No. 14-1009 (KM)<br><br>OPINION |

**KEVIN MCNULTY, U.S.D.J.:**

    The plaintiff, Raymond Fawole, alleges that his employment was wrongfully terminated. Before this Court is the motion of the defendant employer, Newark Beth Israel Hospital, for summary judgment. (ECF. No. 46) The plaintiff has not submitted evidence sufficient to create a genuine, material issue of fact. For the reasons expressed below, the motion will be granted.

**I.    FACTUAL BACKGROUND**

    **A.    Employment, Duties, and Hospital Policy**

    The plaintiff, Mr. Fawole, commenced his employment at the Hospital on January 28, 2008. He was a Supervisor in the Psychiatric Emergency Screening Service (PESS) Unit. (DSMF ¶ 4)[1] Mr. Fawole worked the night shift, 11 pm to 7 am, Mondays through Fridays. (DSMF ¶¶ 5–8) His duties included supervision of triage of incoming patients, assignment of cases to staff members, supervision of treatment plans for patients, and patient care as needed. (DSMF ¶¶ 10–13) He was responsible for adhering to Hospital policies, and ensuring that those under his supervision did so. (DSMF ¶¶ 14–15) Among

---

[1]    DSMF = Defendant's Statement of Material Facts, ECF no. 46-1

those policies was a Pledge to Deliver Exceptional Care, which required that he "respond as promptly as possible when a patient asks for assistance." (DSMF ¶¶ 16–17) Another source of policy was the Employee Handbook, signed and acknowledged by Mr. Fawole in its original and revised 2011 form. (DSMF ¶¶ 18–20) Both versions required that employees discharge their responsibilities "in a professional and satisfactory manner," while adhering to the Hospital's policies and standards. (DSMF ¶¶ 21–22) Supervisors were required to ensure that their subordinates did so as well. (DSMF ¶¶ 23–24)

Mr. Fawole acknowledged that the length of a lunch or other break was in the range of 30 to 35 minutes, and that a 1, 2, or 3 hour break was not permissible. (DSMF ¶¶ 25–27) The Employee Handbook specifically provides that employees shall not engage in certain activities, including

> Leaving work area without permission during working hours for other than a prescheduled rest period, or failing to return to work as scheduled.
> Inattention to duty during working hours including loafing or sleeping, at any time during a shift, including breaks and mealtimes.
> Neglect of duty (unauthorized absence from the employee's work area) and/or negligence in the performance of assigned duties.

(DSMF ¶ 28) Those policies bound Mr. Fawole, and he was also required to ensure that subordinates abided by them. (DSMF ¶¶ 34–35) Mr. Fawole acknowledged in his deposition that he and other employees were not permitted by Hospital policy to sleep during their shifts. (DSMF ¶¶ 29–32)

### B. Disciplinary History and Complaints

On March 5, 2012, Mr. Fawole was disciplined based on a loud and disruptive argument with a co-employee over the smell of food being heated in a microwave. Although no violence took place, the Hospital regarded Mr. Fawole's words as threatening to the other employee. The incident is significant here because it resulted in a final warning. Mr. Fawole did not appeal. (DSMF ¶¶ 54–59)

On December 19, 2012, PESS Director Helen Hartney received an email

2

complaint from the evening supervisor, Jean Aldinor. Mr. Aldinor complained that Mr. Fawole had used loud and offensive language toward him. (DSMF ¶¶ 60–65) Human Resources investigated. According to a witness statement, Fawole had refused to help Aldinor and was sleeping at a table. The witness stated that sleeping was typical of Mr. Fawole. (DSMF ¶¶ 66–71) Human Resources undertook an investigation.

On December 31, 2012, there was second employee complaint about Mr. Fawole sleeping during the night shift. This complaint, like the one on December 19, was referred to Human Resources for investigation. (DSMF ¶¶ 72–74)

### C.   Investigation of Employees Sleeping on Duty

After the December 31, 2012 complaint, Human Resources requested that Director Hartney review security camera video. She did so. (DSMF ¶¶ 74–75)

The PESS Unit has security cameras. The images that they capture appear in real time on a monitor at the nursing station. The patient care area is also directly observable from the nursing station through glass. Behind the nursing station, through a door, is a small galley kitchen and storage area for nursing supplies. The kitchen area is used to prepare food and medication for patients, as opposed to employees. (DSMF ¶¶ 36–42, 49)

At one end of the kitchen is a locked door onto a hallway. A pass card is required to gain access from that hallway back into the kitchen and PESS Unit. (DSMF ¶ 48) Across that hallway is another door which leads to a back office. PESS employees use that back office as a meal or break room, and refer to it as such. There is a security camera in that break room. (DSMF ¶¶ 36–46)

The images from the security cameras are digitally stored and retained for a limited period. They can be retrieved until they are deleted. (DSMF ¶¶ 50, 51)

Mr. Fawole's letter submission raises an issue as to the location of the

cameras, which he says were undisclosed and unknown to him. He states that the cameras were "planted" and that he and "a chosen few" were unfairly targeted by the surveillance. (Fawole Ltr at 3–4)[2]

Hartney's review of the surveillance video revealed that, in the back office/break room, employees were sleeping on duty during the night shift on January 10 and 11, 2013. (DSMF ¶ 76) Hartney reported those results to Human Resources and, in January 2013, reviewed the relevant video files with Human Resources Generalist Coleen Murphy, Vice President of Human Resources Zachary Lipner, and Assistant Vice President of Behavioral Health Laura Budinick. (DSMF ¶¶ 77, 78)

From their review of the video, they concluded the following. During the night shift on January 10, 2013, Mr. Fawole and another PESS employee, Raymond Spence, were sleeping. During the night shift on January 11, 2013, Mr. Fawole and another PESS employee, Ms. Joseph, were sleeping. (DSMF ¶ 79) All three were on duty at the time, and Mr. Fawole was acting as night supervisor. (DSMF ¶¶ 80–83)

In his letter submission, Mr. Fawole states that the administration was "unable to prove that [he] was actually sleeping," and that in fact he was not. (Fawole Ltr. at 3 ¶3) He states that an unnamed employee told him he "was being set up," and that a Hospital employee was "pulling a recording tape of me" from a camera that was "inconspicuously placed." (Fawole Ltr at 4 ¶3)

Director Hartney's review of the video revealed no other employees who were sleeping, taking extended breaks, or failing to perform their duties. (DSMF ¶¶ 84–86)

### D. Resulting Disciplinary Charges and Their Disposition

Mr. Fawole, who was already on final warning at the time, was charged with sleeping on the unit in violation of the Standards of Employee Workplace Behavior and with unauthorized absence beyond normal break times in

---

[2] Fawole Ltr = Plaintiff's letter submission in response to motion, ECF no. 51

violation of Hospital policy. (DSMF ¶ 90) Because he was a supervisor, he was also charged with failure to supervise employees who slept and took extended breaks. (DSMF ¶ 91) The charges were based on the surveillance video.

In his letter submission, Mr. Fawole takes issue with the disciplinary procedure. He notes that he was told to meet with the PESS Director and a Nurse, and was orally, without further documentation, suspended immediately pending the outcome of investigations. (Fawole Ltr at 4–5 ¶3)

Mr. Fawole was offered the opportunity to resign in lieu of termination. He elected to resign in lieu of termination on January 18, 2013. (DSMF ¶¶ 93, 94) He complains, however, that he could not escape these options. (Fawole Ltr at 5 ¶3) He alleges that the true basis for targeting him was not sleeping on the job, but discrimination based on his age and origin. (Fawole Ltr at 2 ¶1)

Also as a result of matters observed on the video, Ms. Joseph was charged with sleeping on the unit and taking unauthorized breaks. She, too, was offered the opportunity to resign in lieu of termination, and she did resign on January 22, 2013. (DSMF ¶¶ 95–97)

Also as a result of matters observed on the video, Mr. Spence was charged with sleeping on the unit and taking unauthorized breaks. He, too, was offered the opportunity to resign in lieu of termination. (DSMF ¶¶ 87, 88) Unlike Fawole and Joseph, Spence declined the option to resign. He was terminated effective January 16, 2013. (DSMF ¶ 89)

In his submission, Mr. Fawole emphasizes several additional points. First, he states that the time card system was inaccurate and prone to manipulation. (Fawole Ltr at 5–6 ¶4) Second, he always made himself available for extra shifts and other duties, cutting into his sleep and family time. (Fawole Ltr at 6–7 ¶5) Third, he has never abused sick or vacation time, and in fact has forfeited 300 hours of each. (Fawole Ltr at 7 ¶6) Fourth, he relates at length examples of his faithful and conscientious service. (Fawole Ltr at 7–11 ¶8)

### E. Subsequent Procedural History

On November 4, 2013, Mr. Fawole filed a charge with the U.S. Equal Employment Opportunity Commission (EEOC). He asserted claims of discrimination based upon age, and retaliation, in violation of the Age Discrimination in Employment Act (ADEA). The EEOC issued a Dismissal and Notice of Right to sue dated November 22, 2013. (DSMF ¶¶ 98–100)

On February 18, 2014, Mr. Fawole filed the complaint in this action. (ECF no. 1) On August 21, 2014, the Hospital answered the complaint. (ECF no. 9) Following the close of discovery, on December 18, 2015, the Hospital filed the summary judgment motion that is the subject of this Opinion. (ECF no. 46)

## II. DISCUSSION

### A. Summary Judgment Standard

Federal Rule of Civil Procedure 56(a) provides that summary judgment should be granted "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." FED. R. CIV. P. 56(a); *see also Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986); *Kreschollek v. S. Stevedoring Co.*, 223 F.3d 202, 204 (3d Cir. 2000). In deciding a motion for summary judgment, a court must construe all facts and inferences in the light most favorable to the nonmoving party. *See Boyle v. County of Allegheny Pennsylvania*, 139 F.3d 386, 393 (3d Cir. 1998) (citing *Peters v. Delaware River Port Auth. of Pa. & N.J.*, 16 F.3d 1346, 1349 (3d Cir. 1994)). The moving party bears the burden of establishing that no genuine issue of material fact remains. *See Celotex Corp. v. Catrett*, 477 U.S. 317, 322–23 (1986). "[W]ith respect to an issue on which the nonmoving party bears the burden of proof ... the burden on the moving party may be discharged by 'showing'—that is, pointing out to the district court—that there is an absence of evidence to support the nonmoving party's case." *Celotex*, 477 U.S. at 325.

Once the moving party has met that threshold burden, the non-moving party "must do more than simply show that there is some metaphysical doubt as to material facts." *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986). The opposing party must present actual evidence that creates a genuine issue as to a material fact for trial. *Anderson*, 477 U.S. at 248; *see also* FED. R. CIV. P. 56(c) (setting forth types of evidence on which nonmoving party must rely to support its assertion that genuine issues of material fact exist). "[U]nsupported allegations ... and pleadings are insufficient to repel summary judgment." *Schoch v. First Fid. Bancorporation*, 912 F.2d 654, 657 (3d Cir. 1990); *see also Gleason v. Norwest Mortg., Inc.*, 243 F.3d 130, 138 (3d Cir. 2001) ("A nonmoving party has created a genuine issue of material fact if it has provided sufficient evidence to allow a jury to find in its favor at trial."). If the nonmoving party has failed "to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial ... there can be 'no genuine issue of material fact,' since a complete failure of proof concerning an essential element of the nonmoving party's case necessarily renders all other facts immaterial." *Katz v. Aetna Cas. & Sur. Co.*, 972 F.2d 53, 55 (3d Cir. 1992) (quoting *Celotex*, 477 U.S. at 322–23).

The plaintiff, Mr. Fawole, has submitted only a letter brief in response to the summary judgment motion. If the opposing party fails to properly address a party's properly supported motion, the court may consider "grant[ing] summary judgment if the motion and supporting materials—including the facts considered undisputed—show that the movant is entitled to it ...." FED. R. CIV. P. 56(e). And Local Civil Rule 56.1(a) deems a movant's statement of material facts to be undisputed where the opposing party does not respond to it or file a counterstatement. L. CIV. R. 56(a). Failure to dispute a party's statement of material facts, however, "is not alone a sufficient basis for the entry of a summary judgment." *Anchorage Assocs. v. Virgin Islands Bd. of Tax Review*, 922 F.2d 168, 175 (3d Cir. 1990) Even where a local rule deems unopposed contentions to be conceded, the court must still assess the summary judgment

motion for legal and factual sufficiency under the standard of FED. R. CIV. P. 56(e). *Id.*; *see also Muskett v. Certegy Check Servs., Inc.*, Civ. No. 08-3975, 2010 WL 2710555 (D.N.J. July 6, 2010) (citing *Anchorage*).

### B. ADEA Claim

The complaint alleges discriminatory discharge based on "Retaliation & Age." (ECF no. 1 at 3 ¶10) The administrative Charge of Discrimination, attached to the complaint as an exhibit, explicitly invokes the "Age Discrimination in Employment Act of 1967, as amended (ADEA)." (ECF no. 1-1) I therefore treat the complaint primarily as one under the ADEA.[3]

The ADEA makes it unlawful for an employer to fire or refuse to hire someone on the basis of his or her age. 29 U.S.C. § 623(a). An ADEA claim is analyzed within the familiar *McDonnell Douglas* burden-shifting framework. *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802-03, 93 S. Ct. 1817 (1973). *See Scheidemantle v. Slippery Rock University State Sys. of Higher Educ.*, 470 F.3d 535, 539 (2006) (citing *McDonnell Douglas*). If the employee establishes a prima facie case of age discrimination, the burden then shifts to the employer to advance a legitimate, nondiscriminatory reason for its conduct. *Id.* at 342. If the employer does that, the burden then shifts back to the plaintiff, who must convince the fact-finder that the employer's proffered "reason" is false, and that the real reason for the adverse employment action was discriminatory. *Id.* (citing *Krouse v. Am. Sterilizer Co.*, 126 F.3d 494, 500-01 (3d Cir.1997). To

---

[3] Mr. Fawole's letter submission in response to the summary judgment motion makes a single, unexplained reference to discrimination based on "origin." (Fawole Ltr at 2 ¶1) ("It is clear that I was terminated for Age Discrimination and Discrimination against my origin.") Neither the complaint nor any other evidence relates to race or national origin discrimination, and no factual basis for such a claim is suggested. At any rate, to the extent that a Title VII discrimination claim might have been intended, it would necessarily be denied for failure to exhaust administrative remedies. The record demonstrates that the plaintiff did not "first file a charge with the EEOC" of race/national origin discrimination. *Webb v. City of Philadelphia*, 562 F.3d 256, 262 (3d Cir. 2009). The filing of such a charge, and the EEOC's issuance of a right to sue letter, are jurisdictional prerequisites for a Title VII claim. *See Hicks v. ABT Assocs.*, 572 F.2d 960, 963 (3d Cir. 1978). Mr. Fawole failed to demonstrate or even allege that race or national origin discrimination was fairly within the scope of the EEOC proceedings. *Antol v. Perry*, 82 F.3d 1291, 1295 (3d Cir. 1996).

defeat summary judgment, the plaintiff must produce some evidence from which a jury could reasonably reach these conclusions. *Id.* (citing *Fuentes v. Perskie*, 32 F.3d 759, 764 (3d Cir.1994)).

The initial *McDonnell* showing of a prima facie case under the ADEA is fourfold. A plaintiff must show: (1) he[4] belonged to a protected class [*i.e.,* persons over 40], (2) he was qualified for the job, (3) he suffered an adverse employment action, and (4) others not in the protected class were treated more favorably. *See McDonnell Douglas*, 411 U.S. at 802; *Sarullo v. U.S. Postal Serv.*, 352 F.3d 789, 797 n. 6 (3d Cir. 2003) ("The requirements for a prima facie case of Title VII race discrimination and age discrimination under the ADEA are substantially the same" except that the protected class for ADEA purposes comprises persons forty years of age or older). To establish a prima facie case, the plaintiff must demonstrate some causal nexus between his membership in a protected class and the alleged discriminatory action. *See id.* at 798.

The Hospital points initially to a failure of proof on the fourth element of a prima facie case: that others under 40 years of age were treated disparately under comparable circumstances. An inference of discrimination may arise if younger employees received more lenient treatment than that afforded plaintiff. *See Simpson v. Kay Jewelers, Div. of Sterling, Inc.*, 142 F.3d 639, 645 (3d Cir. 1998). The comparison, however, must be apt and clear. "[T]o be considered similarly situated, comparator employees must be similarly situated in all relevant respects." *Wilcher v. Postmaster Gen.*, 441 F. App'x 879, 881-82 (3d Cir. 2011) (citing *Russell v. University of Toledo*, 537 F.3d 596 (6th Cir.2008); *Lee v. Kansas City S. Ry. Co.*, 574 F.3d 253, 259–261 (5th Cir.2009)). In particular, a court must consider whether the two individuals are similar with respect to the particular basis for plaintiff's termination:

> In determining whether similarly situated nonmembers of a protected class were treated more favorably than a member of the

---

[4] I will use the pronoun corresponding to the plaintiff's actual gender, even when referring to a generic plaintiff.

> protected class, the focus is on the particular criteria or qualifications identified by the employer as the reason for the adverse action. The employee's positive performance in another category is not relevant and neither is the employee's judgment as to the importance of the stated criterion. Furthermore, the court does not subjectively weigh factors it considers important. Rather, the plaintiff must point to evidence from which a factfinder could reasonably infer that the plaintiff satisfied the criterion identified by the employer or that the employer did not actually rely upon the stated criterion.

*Simpson*, 142 F.3d at 647 (internal citations and quotations omitted). *See also Lowe v. Medco Health Solutions of Willingboro, LLC.*, No. 10-cv-4823, 2012 WL 1495440, at *9 (D.N.J. Apr. 27, 2012) (collecting cases).

Before the EEOC, Mr. Fawole alleged, but did not substantiate, that "[o]ther individuals have done the same thing and have not been disciplined." Asked in his deposition and in interrogatories to identify any such individual, he was unable to do so, but stated only that he believed there "should" be such examples.[5] The surveillance video of record showed Mr. Fawole and two other persons sleeping during the night shift. To the extent those other two employees might furnish a relevant comparison, it would not aid Mr. Fawole's case. All three received precisely the same treatment: they were offered the opportunity to resign in lieu of dismissal. Mr. Fawole and one other employee resigned. The third refused to do so, and was immediately dismissed. (*See* p. 4, *supra.*)

The comparison fails to raise an inference of discrimination. That failure to establish a prima facie case, standing alone, would be sufficient to require summary judgment, but I briefly analyze the other two *McDonnell Douglass* steps.

The Hospital has clearly articulated a nondiscriminatory reason for the dismissal. Mr. Fawole, like the other two employees, was seen sleeping at a time when he should have been alert to the needs of patients, in violation of

---

[5] The relevant deposition excerpts are attached to the Certification of Lisa Barre-Quick, ECF no. 46-3 at 17–18 (Fawole Dep. Tr. 418, 421–22).

clearly established policy. Mr. Fawole states that he was not really sleeping. He argues, without evidence or facts, that he was targeted. He implies that the use of secret cameras was sneaky and unfair. Whatever factual issue those contentions may raise—and they are not backed by evidence, or even affidavits—would not be a genuine, material, factual issue. The ADEA does not protect against harsh, unfair, or even mistaken, employment decisions; it targets only decisions made discriminatorily, on the basis of age. See *Fuentes v. Perskie*, 32 F.3d 759, 765 (3d Cir. 1994). As to that, there is no evidence whatever.

Nor has Mr. Fawole pointed to any evidence that the stated basis for the dismissal was not the real one, *i.e.*, that it was a pretext. Weak, incoherent, or *post hoc* reasons for dismissal may, in a proper case, give rise to an inference of pretext. Not so here. Mr. Fawole had received a final warning. Sleeping on the job, and permitted subordinates to do so, is plausibly regarded as a firing offense. Two other employees, caught sleeping at the same time (and who presumably were not on final-warning status) were likewise dismissed. Mr. Fawole denies that he was actually sleeping, but does not give any reason to think that the four supervisors who viewed the video could not reasonably have thought he was.

Summary judgment is granted to the Hospital on the ADEA discrimination claim.

### C.  ADEA Retaliation Claim

The complaint, as noted above, cites "Retaliation & Age." That is virtually the only mention of retaliation. I will assume, however, that Mr. Fawole is asserting a claim of retaliation under the ADEA.

The ADEA provides that such retaliation is unlawful:

> It shall be unlawful for an employer to discriminate against any of his employees or applicants for employment ... because such individual, member or applicant for membership has opposed any practice made unlawful by this section, or because such individual, member or applicant for membership has made a

11

charge, testified, assisted, or participated in any manner in an investigation, proceeding, or litigation under this chapter.

29 U.S.C. § 623(d). To state a prima facie case of retaliation, the plaintiff must show that "(1) she engaged in activity protected by [the ADEA]; (2) the employer took an adverse employment action against her; and (3) there was a causal connection between her participation in the protected activity and the adverse employment action." *Moore v. City of Philadelphia*, 461 F.3d 331, 340-41 (3d Cir. 2006) (as amended Sept. 13, 2006).

There is no evidence in the record, however, that Mr. Fawole engaged in any conduct protected under the ADEA: opposing an age-discriminatory practice, making a charge, testifying, etc. The only potentially relevant act was his filing of the EEOC charge. He did that, however, some ten months after, and in response to, his dismissal. It cannot have been the cause of his dismissal; his dismissal cannot have constituted retaliation for it.

Summary judgment is also granted to the Hospital on the claim of ADEA retaliation.

### III. CONCLUSION

For the foregoing reasons, the defendant's motion for summary judgment (ECF no. 46) is GRANTED.

Dated: September 14, 2016

**KEVIN MCNULTY**
**United States District Judge**